# United States Court of Appeals
## For the First Circuit

No. 24-1769

UNITED STATES OF AMERICA,

Appellee,

v.

SHERRIFF COOPER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Gelpí, Rikelman, and Aframe,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, District
of Massachusetts, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Leah B. Foley, United States Attorney, was on brief, for appellee.

August 6, 2026

**RIKELMAN**, <u>Circuit Judge</u>.  A jury found Sherriff Cooper guilty of multiple crimes connected to sex trafficking of a minor, including forced labor.  Cooper now lodges several challenges to his convictions; he claims that one count of the indictment charged more than one crime and that the government failed to produce enough evidence against him at trial.  He also contends that he should have been tried on the forced labor charge in New York, not Massachusetts, or, at a minimum, that the issue of venue should have been put to the jury.  Although we are unpersuaded by Cooper's other arguments, we agree that the jury should have decided if Massachusetts was the proper venue for the forced labor charge.  Thus, we vacate only Cooper's forced labor conviction and remand for further proceedings.

## I. BACKGROUND

### A. Relevant Facts

In early 2017, Cooper worked as a security guard at St. Mary's Center for Women and Children, a Massachusetts Department of Children and Families (DCF) program for young mothers.[1]  At St. Mary's, Cooper -- who was then 30 years

---

[1] Cooper's multiple claims require us to evaluate the record from various perspectives.  For Cooper's challenges to the sufficiency of the evidence against him, "we recount the relevant facts as presented at trial in the light most favorable to the jury's verdict, consistent with record support." <u>United States</u> v. <u>Coleman</u>, 149 F.4th 1, 12 (1st Cir. 2025) (citation modified).  In analyzing his other claims, "we offer a balanced treatment, in

old -- met J.C., a pregnant 15-year-old girl. The two began communicating, both in person and via text message, and eventually started a sexual relationship several months later, once J.C. turned 16 in April.

J.C. gave birth in July 2017 at a local Boston hospital, accompanied by a St. Mary's staff member. During her hospital stay, J.C. asked the St. Mary's staff member to meet "her boo" downstairs to retrieve the food he had brought for her. The staff member recognized J.C.'s "boo" as Cooper and became concerned about the relationship. She reported the incident to St. Mary's, which subsequently filed a "51A" report with DCF -- a report alleging abuse or neglect of a minor -- against Cooper. See Mass. Gen. Laws ch. 119, § 51A. DCF conducted an investigation and determined that the allegation that Cooper sexually exploited J.C. was "supported."

After giving birth, J.C. briefly returned to St. Mary's with her child but soon left to live with her mother. Cooper moved in with her, as they were in a "relationship" by then. While living together, Cooper became violent with J.C., including "chok[ing]" her, "chasing [her] in the street with his car," and "slapp[ing] [her] in [the] face" when he believed that she was cheating on him.

---

which we objectively view the evidence of record." Id. (citation modified).

- 3 -

In October 2017, DCF took custody of J.C.'s child, and J.C. subsequently spent several weeks in a mental-health facility. During those weeks, Cooper sent her letters and bought her a ring.

By December 2017, J.C. had moved to a DCF program for young mothers in Newburyport, Massachusetts. While J.C. was in Newburyport, she and Cooper spoke daily and met in person every week. To prove that she was "loyal" to Cooper, J.C. had sex with him in his car.

J.C. ran away from the Newburyport program in early 2018 to meet Cooper at a local train station. When J.C. arrived, Cooper checked her for wires and broke her cell phone. The two then began living together again, initially with Cooper's aunt in Boston, and eventually in various other places, including Cooper's car.

After Cooper lost his job driving for Uber in the spring of 2018, he told J.C. that she could either "go back to DCF" or "stay with him" and "help him make money" through prostitution. Cooper brought J.C. to a client and taught her "what to do" and "what to say" during the sexual encounter. J.C. had sex with the client, collected $100, and handed the money to Cooper. Cooper told J.C. that she had "done a good job" and "that it wasn't that hard." J.C. was barely 17 at the time.

Cooper eventually bought J.C. a disposable cell phone and taught her how to answer the phone to set up "dates" (a term for prostitution arrangements), including by describing payments

as "donations" or "roses" to avoid detection. He also posted an advertisement on Backpage -- a website that listed escort and prostitution services -- using fake pictures and names and listing the number to the disposable cell phone. After the government shut down Backpage, J.C. continued to schedule dates with previous clients who called or texted her on the disposable phone using the TextNow application.

J.C. testified that, for a period in the spring of 2018, she went on nearly 10 dates per night and worked almost every night of the week. Cooper drove J.C. to these dates, waited for her in his car, and then collected the cash payments from her. If she did not want to work, Cooper would "hit" her and call her "lazy." The "dates" continued through May 2018, shortly after J.C. turned 17.[2]

When J.C. asked Cooper if she could stop engaging in prostitution, he responded "no[t] until [she] [could] go to the strip club." According to J.C., Cooper was referring to a strip club in New York, Junior's Cabaret, which required its performers to be 18.

Cooper and J.C. traveled to New York on April 30, 2018, during the time that J.C. was going on "dates" in Massachusetts,

_____

[2] Although J.C. was uncertain of when exactly the "dates" stopped, she testified that she did not engage in prostitution after moving to New York in June 2018.

but they presented different accounts of the impetus for this trip. According to J.C., because she was 17 at the time, Cooper brought her to New York to obtain a fake ID so that she could work at the strip club. But the ID they procured in New York did not fool the security guard at Junior's Cabaret, and he turned J.C. away. Cooper testified, however, that they traveled to New York to visit his mother and his two children, not to obtain an ID for J.C.[3] For her part, J.C. acknowledged she and Cooper "hung out with [Cooper's] kids" and "met his mom" during the trip but maintained that the purpose of the trip was always to obtain a fake ID.

While Cooper and J.C. were in New York, Cooper posted a prostitution advertisement on another website, Plenty of Fish. Cooper brought J.C. on a "date" he arranged through the website, but J.C. left out of fear of being raped when she encountered multiple men at the meet-up location.

Cooper and J.C. then returned to Massachusetts temporarily. During this interim period, Cooper coerced J.C. to resume "dates" and hit her if she refused to answer the phone, go on a date, or give him the money.

---

[3] We describe Cooper's trial testimony because it is relevant to his venue challenges to Count Three, the forced labor charge. See infra section II.C. But we do not consider this testimony in reviewing the sufficiency of the evidence against Cooper for Counts One and Two, because it was the jury's prerogative not to credit his testimony in reaching its verdict. See infra section II.B.

On June 1, 2018, Cooper and J.C. tried to move to New York. A police officer stopped them en route because of the window tint of Cooper's car. After initially providing the police with a fake name, J.C. eventually divulged her real identity. Because J.C. was an underage "runaway," the officer returned her to DCF custody but allowed Cooper to leave. Soon after, J.C. escaped from DCF custody again, and Cooper picked her up and drove them to New York that same day. While they were driving, Cooper destroyed J.C.'s prepaid phone so they could not "be caught with it."

In New York, Cooper and J.C. lived in various places throughout the summer and fall of 2018, including with Cooper's mother in the Bronx. During this time, Cooper occasionally worked as a janitor at a high school and later as a security guard. By August, Cooper had obtained another ID for J.C., which was a legitimate ID that belonged to a neighbor's daughter. J.C. applied to work at Junior's Cabaret with this ID, and she became a regular performer by mid-September, when she was still 17. J.C. testified that she gave her earnings -- between $600 to $1,000 per shift -- to Cooper.

J.C. described Cooper as "extremely violent" during their time in New York. According to J.C., Cooper hit her and sent her profanity-filled and violent text messages. One August text read: "Bitch I'll fuckin cut ya throat" and "when I see you tonight, I'm gonna fuck you up." In the fall of 2018, J.C. told

Cooper she was pregnant, but Cooper said she could still work because she was not "showing yet" and was just "being lazy." He allowed her "a couple days off" after she had an abortion. And in December, an upset Cooper came to Junior's Cabaret when J.C. did not answer her phone and tried to follow her into the dancers' dressing room, causing a scene. Finally, in late March or early April 2019, J.C. told Cooper she was pregnant again and could not work because it hurt her. After an argument, Cooper choked J.C. over the bathtub, making her fear for her pregnancy. On the heels of this abuse, and soon after she turned 18, J.C. returned to Boston using a bus ticket that Cooper's mother had bought for her.

J.C. gave birth to their child in October 2019, and she and Cooper continued to communicate via phone and text during this time. One October text from Cooper read: "I'm so sorry for putting you in that game," which J.C. testified was a term for prostitution (and Cooper maintained was about stripping). In a separate text, Cooper again apologized for having her "in that life." In a series of text exchanges during this time, J.C. wrote: "All you want to do is be a drug dealing, rapper, pimp" and implored Cooper to "go get someone else pregnant and beat them up." A few messages later, Cooper admitted: "I get emotional [when] I'm hurt and lonely like [I] said I'm sorry. Everything you said about me is true." In November, J.C. and Cooper moved to New Jersey to attempt to live together again, this time with their baby. But, after four or

five months, in the spring of 2020, J.C. moved out and called the police after an argument when Cooper spit in her face.

After J.C. left Cooper, he sought visitation time with their son. J.C. filed for a restraining order against Cooper in June 2020 and requested an extension of the restraining order in October 2020. She also spoke with law enforcement, leading to Cooper's ultimate arrest on the charges at issue in this case.

## B. Procedural History

In June 2021, a grand jury charged Cooper with three crimes: sex trafficking of a minor and by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1), and (b)(2) ("Count One"); transportation of a minor with intent that the minor engage in illegal sexual activity, in violation of 18 U.S.C. § 2423(a) ("Count Two"); and forced labor, in violation of 18 U.S.C. § 1589(a) ("Count Three").

Before trial, Cooper filed multiple pro se motions to dismiss and quash the indictment. He contended that Count One was duplicitous and failed to provide fair notice of the charges against him. And he challenged the venue for both Counts One and Three.

The district court denied each of Cooper's motions to dismiss, and Cooper proceeded to trial. Both J.C. and Cooper testified, along with a number of other witnesses. After the government rested its case, Cooper moved for an acquittal arguing

that the government had introduced insufficient evidence to convict him, but the district court denied his motion. See Fed. R. Crim. P. 29(a). Cooper later asserted objections to the jury instructions, including the absence of a venue instruction.

The jury ultimately convicted Cooper on all three counts. As to Count One -- sex trafficking -- the jury indicated on the verdict form that Cooper "knew, or recklessly disregarded" both "that Ms. J.C. had not attained the age of 18 years" and that "means of force, threats of force, fraud, coercion, or any combination of such means, would be used to cause Ms. J.C. to engage in a commercial sex act."

After the verdict, Cooper filed additional motions, including for acquittal and for a new trial. See Fed. R. Crim. P. 29(c), 33. The district court denied those motions as well. See United States v. Cooper, 744 F. Supp. 3d 107 (D. Mass. 2024). It then sentenced Cooper to 216 months in prison and five years of supervised release. The court also ordered Cooper to pay $97,200 in restitution to J.C.

Cooper timely appealed.

## II. DISCUSSION

Cooper argues that we should reverse each of his convictions. First, he brings various duplicity-related challenges to Count One -- the sex trafficking charge. Second, he challenges the sufficiency of the evidence to convict him on Counts

- 10 -

One and Two.  And finally, he lodges a multi-faceted attack on the venue for Count Three -- the forced labor charge.  He contends that venue was not proper in Massachusetts or, at the very least, that there was a genuine factual dispute about venue that should have been decided by the jury.  As we will explain, we conclude that only one of his challenges has merit.

## A. Duplicity (Count One)

Cooper maintains that Count One -- the sex trafficking charge under § 1591(a)(1) -- was duplicitous on its face, failed to provide him with adequate notice of the charges against him, and raised the risk of a non-unanimous verdict.  At bottom, each of his duplicity-related arguments stems from his claim that § 1591(a)(1) sets out ten separate offenses instead of alternative means of committing the single offense of sex trafficking.  Whether § 1591(a)(1) prohibits more than one offense is a question of first impression for our court.[4]  Because we agree with the district

---

[4] In a recent decision, we stated that a violation of § 1591(a)(1) "requires proof in relevant part that someone: (1) knowingly (2) by means of interstate or foreign commerce, (3) recruited, enticed, [etc.] by any means a person, (4) knowing that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."  United States v. Pires, 138 F.4th 649, 658 (1st Cir. 2025) (citation modified).  Although our description in Pires of what the government must prove to secure a conviction under § 1591(a)(1) suggests that the ten acts listed in the provision are means, not elements, that case did not grapple with the duplicity question we decide today.

court that the critical text in § 1591(a)(1) does not describe ten separate crimes, we reject Cooper's duplicity-related arguments.

We review the district court's denial of Cooper's motion to dismiss Count One on duplicity and lack of proper notice grounds de novo. See United States v. Prieto, 812 F.3d 6, 11 (1st Cir. 2016); United States v. Coleman, 149 F.4th 1, 17 (1st Cir. 2025) (reviewing sufficiency of indictment). And we also review de novo the district court's decision to deny Cooper's request for a unanimity instruction for Count One. See United States v. Rodriguez, 115 F.4th 24, 46 (1st Cir. 2024); United States v. Orlandella, 96 F.4th 71, 90 (1st Cir. 2024) ("[W]e review de novo a party's right to a jury instruction on unanimity because their right to such an instruction is a question of law.").

### 1. Means or Elements?

Cooper contends that Count One, which tracks the language of § 1591(a)(1), was duplicitous, because it "join[ed] in a single count two or more distinct offenses." United States v. Pontz, 132 F.4th 10, 27 (1st Cir. 2025) (citation modified).

The chief evil of a duplicitous indictment is that "the jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of any particular offense." United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995). A duplicitous indictment also "may (1) fail to give the defendant adequate notice of the nature of the charges [against them],

- 12 -

(2) threaten to subject the defendant to prejudicial evidentiary rulings at trial, and (3) produce trial records inadequate to allow a defendant" to raise an objection to a "subsequent prosecution for the same offense." United States v. D'Amico, 496 F.3d 95, 99 n.3 (1st Cir. 2007), judgment vacated on other grounds, 552 U.S. 1173 (2008). Thus, the prohibition on duplicity seeks to safeguard a defendant's right not to be tried twice for the same crime, guaranteed by the Fifth Amendment, and to a verdict by a unanimous jury, guaranteed by the Sixth Amendment. See United States v. Trainor, 477 F.3d 24, 32 n.16 (1st Cir. 2007) (noting that "a jury may find a defendant guilty on [a duplicitous] count without having reached a unanimous verdict on the commission of any particular offense, which in turn may prejudice a later double jeopardy defense" (citation modified)); U.S. Const. amend. V, § 2 (protecting the right not to be tried twice "for the same offense"); U.S. Const. amend. VI, § 1 (preserving the right to trial "by an impartial jury").

Count One charged Cooper with violating 18 U.S.C. § 1591, which is titled "Sex trafficking of children or by force, fraud, or coercion." Section 1591(a) states:

(a) Whoever knowingly --

(1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises,

- 13 -

> maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

Count One tracked the language of § 1591(a)(1). It alleged that Cooper:

> [D]id knowingly, in and affecting interstate commerce, recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize and solicit by any means [J.C.], knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means, would be used to cause [J.C.] to engage in a commercial sex act, and knowing and in reckless disregard of the fact that [J.C.] had not attained the age of 18 years and would be caused to engage in a commercial sex act.

According to Cooper, the ten acts listed in § 1591(a)(1) -- "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits" -- represent distinct elements of ten separate offenses.

- 14 -

See United States v. Taylor, 848 F.3d 476, 492 (1st Cir. 2017) ("Some statutes are divisible, meaning they list elements in the alternative."). The government contends, however, that the provision lists ten alternative means of committing just one offense: sex trafficking. See Schad v. Arizona, 501 U.S. 624, 636 (1991) (explaining that statutes "frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes"), abrogated on other grounds by Edwards v. Vannoy, 593 U.S. 255 (2021).

Ultimately, to resolve this means-versus-elements dispute, we must determine Congress's intent in enacting § 1591(a)(1). As we have held, "[w]hether a particular fact is a means or an element is a 'value choice more appropriately made in the first instance by a legislature than by a court.'" United States v. Verrecchia, 196 F.3d 294, 299 (1st Cir. 1999) (citation modified) (quoting Schad, 501 U.S. at 637). In conducting our analysis of what Congress intended, we "begin[] -- and sometimes end[] -- with the text of the statute of conviction." United States v. Lee, 317 F.3d 26, 37 (1st Cir. 2003) (explaining how to determine "the extent to which jury unanimity is required"). If the statute's text "does not furnish decisive guidance," we expand our analysis to the "overall structure of the law," the "statute's legislative history," "relevant legal traditions," and any

- 15 -

"implications for unfairness."  Id. (citing Richardson v. United States, 526 U.S. 813, 819-20 (1999); Schad, 501 U.S. at 637-38).

We start with the text of § 1591.  Four aspects of the text, when viewed together, indicate that Congress intended the ten acts in § 1591(a)(1) to describe different means of committing a single crime rather than elements of ten separate crimes.  First, "the proscribed conduct is listed in a single sentence" within § 1591(a)(1).  United States v. Bradford, 148 F.4th 699, 707 (9th Cir. 2025) (discussing § 1591(a)).  By contrast, Congress has used separate subsections in other statutes to "set out [separate crimes] in the alternative."  Taylor, 848 F.3d at 492 (concluding the assault statute at issue "is plainly divisible" as "the subsections [(a) and (b)] are set out in the alternative").  Consistent with this principle, at least one court has concluded that subsections (1) and (2) in § 1591(a) represent different crimes.[5]  See United States v. Lewis, No. 19-cr-307, 2021 WL 2809819, at *6-7 (D.D.C. July 6, 2021).

Second, the "nature of the behavior" that underlies most of the ten acts does not "differ[] so significantly" so as to warrant treating them as different crimes.  Chambers v. United States, 555 U.S. 122, 126 (2009), abrogated on other grounds by Johnson v. United States, 576 U.S. 591 (2015); see id. at 127

---

[5] Count One did not charge Cooper under § 1591(a)(2), so this provision of the statute is not at issue.

- 16 -

(determining that the relevant phrases in the statute at issue did not define separate crimes because the phrases "describe[d] roughly similar forms of behavior").  Instead, many of the ten acts, such as enticing and recruiting, cover overlapping conduct and "amount to variations on a single theme."  Id. at 127.

No doubt, Cooper makes a valid point that there is less overlap between some of the ten acts than others.  For example, he contends that "providing" covers conduct that is arguably inconsistent with "patronizing."  And he emphasizes that advertising is qualitatively different from all the other acts listed in § 1591(a)(1).  But Cooper's argument throughout this case has been that Congress intended that each of the ten acts listed in § 1591(a)(1), no matter how similar, be treated as an element of a separate crime.  And, as we explained, accepting his argument would require us to ignore the overlapping nature of many of the listed acts, such as recruiting and enticing.  Cf. United States v. Burwell, 122 F.4th 984, 991 (D.C. Cir. 2024) ("The fact that [the two statutory words] 'intimidation' and 'extortion' are synonyms is strong evidence that Congress viewed extortion and intimidation as alternative means to commit bank robbery.").  Yet, Cooper provides no principled or practical reason why we should ignore that aspect of § 1591(a)(1)'s text.  Cf. Mathis v. United States, 579 U.S. 500, 506 (2016) (explaining that the inclusion of

"diverse means" in a statute "merely . . . spells out various factual ways of committing . . . the offense").

Third, we do not read the inclusion of the phrase "by any means" at the end of the list of acts in § 1591(a)(1) to signal Congress's intent to create ten separate crimes. In Cooper's view, comparing Congress's use of "by any means" in this portion of the provision to its use of the word "means" at the end of § 1591(a) indicates that Congress intended the acts listed to represent elements of ten separate crimes and specified that those elements could be committed "by any means." Indeed, he argues that any other reading of § 1591(a)(1) would make the provision redundant.

But we see no redundancy in § 1591(a)(1). Each of the ten acts listed -- such as "recruit[ing]" or "entic[ing]" -- can be accomplished in a multitude of ways. As Cooper admits, one can "entice" a person with money, candy, or promises of stability. Thus, the phrase "by any means" at the end of § 1591(a)(1) can be read just as easily to confirm Congress's view that any form of enticement or recruitment, for example, that caused a person to engage in a commercial sex act amounts to a violation of the statute.

Fourth, the penalty for violating § 1591(a)(1) does not depend on which of the ten acts a defendant committed. See 18 U.S.C. § 1591(b). Instead, it depends on two other aspects of the offense: (1) the age of the minor, and (2) whether "the offense

- 18 -

was effected by means of force" or "not so effected."  Id. § 1591(b)(1), (b)(2).  Thus, whether the defendant engaged in advertising or enticement, for example, makes no difference.  That Congress calibrated the penalty for sex trafficking to other aspects of a defendant's conduct indicates that Congress did not have "an intent . . . to link culpability" to a particular act listed in § 1591(a)(1), undermining the conclusion that each act is a separate element.  Verrecchia, 196 F.3d at 299-300 (concluding that the punishment provisions in the felon-in-possession statute did not support a claim that the nature or number of firearms possessed was an element of the crime).

To be sure, Cooper highlights features of the text that arguably skew in his favor.  He points out that § 1591(a) uses the term "violation" and contends that the Supreme Court held in Richardson that Congress's use of that term in the continuing criminal enterprise (CCE) statute, 21 U.S.C. § 848, "support[ed] the conclusion" that the text at issue described separate elements. See 526 U.S. at 818-19 (reasoning that the "tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that 'violates' the law" supports the conclusion that "each 'violation'" in the phrase "continuing series of violations" of the federal drug laws "amounts to a separate element").

But Cooper ignores that the term "violation" in the CCE statute appears in the critical text describing the crime

- 19 -

itself -- "a person is engaged in a continuing criminal enterprise if . . . such violation is a part of a continuing series of violations of [the relevant provisions in the criminal code] . . . ." 21 U.S.C. § 848(c)(2). Whereas, in § 1591(a), "violation" is part of a textual sentence making clear that the mens rea for advertising is different than that for the other acts listed in § 1591(a)(1). Cooper also claims that the "extremely broad" scope of the acts in § 1591(a)(1) is akin to the broad sweep of the CCE statute. But this comparison does not hold up. The word "violation" in the CCE statute "covers many different kinds of behavior of varying degrees of seriousness," from removing drug labels to distributing large quantities of drugs, prohibited by the 90 sections of the federal criminal code that set out drug crimes. Richardson, 526 U.S. at 819. By contrast, § 1591(a)(1) is a single subsection that describes ten largely overlapping acts.

Cooper's final textual argument highlights the different mens rea for "advertising." See 18 U.S.C. § 1591(a) (". . . knowing, or, except where the act . . . is advertising, in reckless disregard of the fact, that means of force" will cause a commercial sex act (emphasis added)). And he is correct that a different mens rea is one indication that statutory text corresponds to an element not just a means. See, e.g., United States v. Tavares, 843 F.3d 1, 14 (1st Cir. 2016) (concluding an

offense "reads as a divisible statute" given one section "requires a heightened mens rea").

Cooper then contends that, at a minimum, we should hold that "advertising" is a separate offense under § 1591(a)(1) and dismiss Count One on the ground that it is duplicitous "in part." But Cooper did not make this argument to the district court or in his opening brief on appeal. Thus, he has both forfeited and waived this argument, and we leave for another day whether the provision's text supports treating "advertising" as a separate offense. See United States v. Shafa, 175 F.4th 1, 29 n.9 (1st Cir. 2026) (explaining that "[w]e have consistently held that . . . arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived" (quoting parenthetically United States v. Pizarro-Berrios, 448 F.3d 1, 5-6 (1st Cir. 2006))); United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008) (explaining that forfeiture occurs when "a party fails to make a timely assertion of a right" at the district court (citation modified)). All told, we conclude that § 1591(a)(1)'s text does not support treating all of the listed acts as elements instead of means.

But even if the text were inconclusive, the legislative and statutory history of § 1591 convinces us that the government has the better argument about its meaning. See Verrecchia, 196 F.3d at 300 (considering legislative history as "further evidence

- 21 -

of Congressional intent"). Congress enacted Section 1591 as part of the Victims of Trafficking and Violence Protection Act of 2000 ("the Act"). See Pub. L. No. 106-386, 114 Stat. 1464 (2000). In findings accompanying the Act, Congress explained that "[e]xisting legislation" in the United States prohibiting sex trafficking was "inadequate," a "comprehensive law" was needed to "bring traffickers to justice," and the Act's purpose was to ensure "effective punishment of traffickers." Id. Div. A., § 102(a), (b)(14). Division A of the Act is titled the "Trafficking Victims Protection Act" (TVPA). Section 1591 is part of the TVPA and falls under the subsection "Strengthening Prosecution and Punishment of Traffickers." Id. Div. A., § 112.

Importantly, the Act contains a definitions section, including for the term "Sex Trafficking." In 2000, Congress defined sex trafficking as "the recruitment, harboring, transportation, provision, or obtaining of a person for the purpose of a commercial sex act." Id. Div. A, § 103(9). This definition of the crime of "sex trafficking" mirrored the list of acts in the original version of § 1591(a)(1), except that the verb "entice[]" also appeared in the original version. See id. Div. A., § 112.

Over time, Congress amended § 1591(a)(1) to add to the list of prohibited acts. A 2008 amendment added "maintains." See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 222, 122 Stat. 5044, 5069.

- 22 -

And a later amendment via the Justice for Victims of Trafficking Act of 2015 added "patronizes" and "solicits" with the purpose of "clarify[ing] the range of conduct punished as sex trafficking." Pub. L. No. 114-22, § 108, 129 Stat. 227, 238-39. Finally, Congress added "advertises" to expand § 1591(a)(1) to its current form. See id. § 118.

Both the original definition of the term "sex trafficking" in the Act, which mirrored the original version of § 1591(a)(1), and Congress's amendments to § 1591(a)(1), indicate that it considered this provision to prohibit one crime of sex trafficking, which could be accomplished through multiple means. Cooper has not pointed to any legislative or statutory history to the contrary. Thus, the best evidence indicates that Congress's focus in enacting § 1591(a)(1) was "the scope of the crime of [trafficking] as a whole, [not] each act . . . comprised within that whole." Lee, 317 F.3d at 39.

Finally, the other factors -- such as "[c]onsiderations of tradition and potential unfairness" -- do not obviously weigh in Cooper's favor. Verrecchia, 196 F.3d at 300-01. Cooper contends that our interpretation of the acts as means would "undermine[] the constitutional requirement of juror unanimity," because it risks "covering up disagreements about what the defendant did." But, as the government points out, treating the ten acts listed in § 1591(a)(1) as elements of ten different

- 23 -

offenses would permit the government to charge an individual with multiple crimes for conduct such as enticing a sex trafficking victim and recruiting that same victim. Cooper does not explain how that outcome would be more consistent with tradition or more likely to ensure fairness for defendants.

Thus, we reject Cooper's argument that Count One was duplicitous because § 1591(a)(1) sets out ten separate offenses. See United States v. Garcia-Torres, 341 F.3d 61, 66 (1st Cir. 2003) (quoting United States v. Barbato, 471 F.2d 918, 922 n.3 (1st Cir. 1973) (explaining "it is permissible for a count in an indictment to allege all or several" of the "different means" listed in a statute)). Our holding is consistent with the decisions of two of our sister circuits, which have considered similar issues. See United States v. Paul, 885 F.3d 1099, 1104 (8th Cir. 2018) (suggesting that § 1591(a)'s statutory language of "recruits, entices [etc.]" indicates "alternative ways of committing a single offense" in holding that the district court did not plainly err in failing to address issue of duplicity sua sponte); Bradford, 148 F.4th at 705-06 (rejecting argument that "advertising" was an element of a "separate and distinct crime" prohibited by § 1591(a)(1)). To date, no circuit has concluded otherwise.

## 2. Remaining Duplicity Arguments

Because we reject Cooper's duplicity challenge to Count One, his related arguments about lack of notice, the government's

- 24 -

failure to elect a theory of prosecution, and his request for a jury unanimity instruction also fail.

First, we have repeatedly held that an indictment that tracks the language of the criminal statute at issue provides sufficient notice to a defendant of the crime charged. See Coleman, 149 F.4th at 18 (determining that "it was permissible to list each statutorily available method of kidnapping in the alternative in the indictment"). And when a statute lists multiple means of committing that crime, the indictment is not defective because it lists all those means in the alternative. See id.; see also Schad, 501 U.S. at 631 ("[A]n indictment need not specify which overt act, among several named, was the means by which a crime was committed.").

Second, because we disagree with Cooper's duplicity arguments, the government did not need to "elect a theory of prosecution," as Cooper contends. Although a "prosecutor charging a violation of a divisible statute must generally select the relevant element from its list of alternatives," this rule does not apply when a statute prohibits various means of committing a single crime. See Descamps v. United States, 570 U.S. 254, 272 (2013).

Third, the district court did not err in declining to provide Cooper's requested unanimity instruction on the § 1591(a)(1) charge because jury unanimity is not required "with

- 25 -

respect to alternative means of committing one and the same criminal act." United States v. Newell, 658 F.3d 1, 22 (1st Cir. 2011); see United States v. Pena, 910 F.3d 591, 602 (1st Cir. 2018). Cooper maintains that even if § 1591(a) lists alternative means, rather than elements, the court still should have provided a unanimity instruction to avoid confusion. But we have required such a unanimity instruction only when the count at issue was duplicitous. See Newell, 658 F.3d at 23. And we have held that a defendant is "not entitled to a specific unanimity instruction" as to a particular count if that count is not duplicitous. Verrecchia, 196 F.3d at 298. Thus, there was no legal error here.

**B. Sufficiency of the Evidence (Counts One and Two)**

Cooper next contends that the government did not present enough evidence at trial for a rational jury to find him guilty beyond a reasonable doubt as to Counts One and Two. Specifically, for Count One, he argues that the government failed to prove that any sex trafficking was "in or affecting interstate commerce," as required by 18 U.S.C. § 1591. And for Count Two, he claims that the evidence was insufficient to show that he possessed the required "intent that [J.C.] engage in prostitution" when crossing state lines, under 18 U.S.C. § 2423(a). We are not persuaded by either of Cooper's sufficiency arguments.

Cooper moved for acquittal at the close of the government's case on sufficiency grounds as to Counts One and Two,

and renewed the motion at the close of all the evidence, thus preserving his sufficiency claims for appeal. As a result, we review the district court's denial of his Rule 29 motion for acquittal de novo. See Coleman, 149 F.4th at 42.

In evaluating Cooper's sufficiency claims, "the relevant question is whether, after viewing the evidence [at trial] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (citation modified). To answer this question, "we do not view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Minor, 63 F.4th 112, 125 (1st Cir. 2023). For these reasons, "defendants challenging convictions for insufficiency of the evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (citation modified).

### 1. Count One -- Interstate Commerce Element

Section 1591(a)(1) prohibits sex trafficking "in or affecting interstate or foreign commerce." Cooper claims the government's proof on this element was limited to J.C.'s testimony that Cooper purchased an advertisement on Backpage and a cell phone to schedule "dates" for her. He also describes her testimony as "unsupported." According to Cooper, because the government introduced "no ads" or "records" from Backpage, nor any evidence

of where the cell phone was "purchased or manufactured" or that Cooper "used" it, there was not enough evidence for a rational jury to find beyond a reasonable doubt that his actions had a nexus to interstate commerce. We disagree.

Most importantly, Cooper discounts J.C.'s trial testimony in making his sufficiency arguments. J.C. testified that Cooper advertised that she was available for "dates" on Backpage and that he used and instructed her how to use the TextNow application to schedule those dates. If the jury believed her, then it would have faced no obstacle to finding beyond a reasonable doubt that Cooper's actions in sex trafficking J.C. were in or affected interstate commerce. And "[w]hether the jury found [J.C.] credible is a decision we leave to the jury." Lipscomb, 539 F.3d at 40 (rejecting sufficiency challenge). In conducting a sufficiency of the evidence review, we do not question the credibility of witnesses who testified before the jury unless that testimony was "incredible or insubstantial on its face." Id. (quoting parenthetically United States v. Gomez-Pabon, 911 F.2d 847, 853 (1st Cir. 1990) (rejecting sufficiency challenge "even if [the witness's testimony] [was] uncorroborated")). Cooper has not even attempted to make such a claim about J.C.'s testimony.

Cooper is also wrong that J.C.'s testimony was unsupported by documentary evidence. At trial, the government introduced records of the text conversations scheduling the

prostitution dates via the TextNow application. And Cooper acknowledges in his opening brief, as he must, our recent holding that text messages transmitted via the internet can be a sufficient hook for the interstate commerce element of a federal criminal charge. See United States v. O'Donovan, 126 F.4th 17, 34-36 (1st Cir. 2025) (holding that proof of iMessages sent over the internet satisfied the interstate commerce element for a wire fraud charge).

Thus, we reject Cooper's sufficiency challenge as to Count One.

### 2. Count Two -- Intent to Prostitute Element

For Count Two, the government was required to prove that Cooper had the "intent that [J.C.] engage in prostitution" when he transported her from Massachusetts to New York in April 2018. 18 U.S.C. § 2423(a) (criminalizing the knowing transportation of a minor "in interstate or foreign commerce . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense"). To satisfy this element, the government needed to establish that the intent to prostitute J.C. was "at least one of [Cooper's] motivations for taking the trip in the first place," even if not his main motivation. United States v. Tavares, 705 F.3d 4, 17 (1st Cir. 2013) (quoting United States v. Ellis, 935 F.2d 385, 390 (1st Cir. 1991)).

At trial, J.C. testified that this trip to New York occurred during the period that Cooper forced her to go on "dates." And she recounted that Cooper -- very soon after arriving in New York -- posted an advertisement on Plenty of Fish and drove her to a "date." From this testimony, the government contends, the jury could have drawn a reasonable inference that "Cooper did not abandon his intent to gain money from J.C.'s prostitution simply because they crossed state lines."

To be sure, at trial, Cooper presented a different account of the April 2018 trip. He testified that he and J.C. traveled to New York to see his children and mother, because he would not be able to visit for Mother's Day. But the "government's evidence is not insufficient simply because [Cooper] presented a competing scenario." United States v. Torres-Colon, 790 F.3d 26, 33 n.3 (1st Cir. 2015) (quoting United States v. Ayala-García, 574 F.3d 5, 11 (1st Cir. 2009)). As here, when the evidence "turns on witness credibility" and conflicting stories, it is up to "the jury [to] decide[] whom to believe." Ayala-García, 574 F.3d at 11. Based on J.C.'s testimony, a rational jury could have found beyond a reasonable doubt that one of Cooper's purposes in bringing J.C. to New York was for her to engage in prostitution. Thus, we reject Cooper's sufficiency challenge as to Count Two.

- 30 -

## C. Venue Challenges (Count Three)

Finally, Cooper lodges multiple challenges related to venue for Count Three -- the forced labor charge. This count alleged that Cooper violated the forced labor statute, 18 U.S.C. § 1589(a), "in the District of Massachusetts, the Southern District of New York, and elsewhere."

In Cooper's view, the government was required to prosecute him for the forced labor charge in New York, not Massachusetts. He argues that we should vacate his conviction on Count Three for three separate reasons: (1) the district court erred in denying his pretrial motion to dismiss the indictment for lack of proper venue; (2) at trial, the government failed to introduce enough evidence to establish venue in Massachusetts; and (3) at the very least, the jury should have decided the venue issue. We agree with Cooper on the last point.

"Venue in a criminal case is not an arcane technicality." United States v. Salinas, 373 F.3d 161, 162 (1st Cir. 2004). As the Supreme Court recently stated, venue "mattered more than might be supposed to the Nation's Founders." Abouammo v. United States, 146 S.Ct. 1571, 1576 (2026). Indeed, the Constitution "safeguards" a defendant's right to be tried in the proper venue "not once but 'twice.'" Id. (quoting United States v. Cabrales, 524 U.S. 1, 6 (1998)); see U.S. Const. amend. VI, § 1 (establishing the right to trial "by an impartial jury of the State and district wherein the

crime shall have been committed"); U.S. Const. art. III, § 2, cl. 3 (instructing that the "Trial of all Crimes" "shall be held in the State where the said Crimes shall have been committed").[6]

Proper venue exists when there is "a match between the place of commission of the crimes and the state [and district] where the trial" takes place. United States v. Casch, 448 F.3d 1115, 1117 (9th Cir. 2006). The government bears the burden to establish venue by a preponderance of the evidence. See Salinas, 373 F.3d at 163; United States v. Miller, 111 F.3d 747, 749-50 (10th Cir. 1997).

With these principles in mind, we turn to Cooper's three-pronged venue challenge.

### 1. Motion to Dismiss the Indictment

Cooper filed multiple pretrial motions to dismiss Count Three for lack of "territorial jurisdiction (venue)." The government responded with a summary of the evidence it planned to present at trial that connected the charge to Cooper's actions in Massachusetts. It argued that forced labor is a "continuing offense" and that Cooper "formulated and began to execute the plan to force [J.C.] to labor in a strip club while they were still in Massachusetts."

---

[6] Federal Rule of Criminal Procedure 18 also requires a criminal prosecution to occur in "a district where the offense was committed." Fed. R. Crim. P. 18.

The district court denied Cooper's motion to dismiss Count Three for lack of proper venue as "lack[ing] merit."[7]  It explained that the dismissal of an indictment is reserved for "extremely limited circumstances" that were not present in Cooper's case.  (Quoting Whitehouse v. U.S. Dist. Ct. for the Dist. of R.I., 53 F.3d 1349, 1360 (1st Cir. 1995).)  We review de novo the court's ruling denying Cooper's motion to dismiss.  See United States v. Castillo, 158 F.4th 257, 271 (1st Cir. 2025).

Cooper claims that the government laid out all the facts it had to support venue in Massachusetts in its opposition to his motion to dismiss, and that those facts were just not enough.  As he points out, the government's own account made clear that the forced labor -- J.C. working at Junior's Cabaret as a stripper -- took place only in New York and did not begin until September 2018, several months after she and Cooper had moved there from Massachusetts.  Thus, according to Cooper, the district court should have dismissed Count Three for lack of proper venue.

Cooper has failed to show that the "extraordinary step" of dismissing Count Three before trial was warranted here.  See United States v. Stokes, 124 F.3d 39, 44 (1st Cir. 1997).  "[W]hat counts" in "grading an indictment's sufficiency" are its

---

[7]  The district court's order referenced and denied collectively the 13 pre-trial motions that Cooper had filed pro se, so the court did not separately address Cooper's venue argument.

- 33 -

"allegations, which we must assume are true." United States v. Guerrier, 669 F.3d 1, 3-4 (1st Cir. 2011). And this is so "even when the challenge centers on the adequacy of the evidence concerning" a "jurisdictional prerequisite." Id. (affirming the sufficiency of an indictment against a defendant's challenge that the government "had produced no evidence" to satisfy the statute's interstate commerce element (emphasis omitted)).

When the government opposed Cooper's motion to dismiss, it previewed J.C.'s expected testimony that, when she asked Cooper if she could stop engaging in prostitution in Massachusetts, he responded not until she started stripping in New York. And, according to J.C., he then drove her to New York for the specific purpose of obtaining a fake ID so that she could work at Junior's Cabaret. The government went on to contend that, because forced labor is a continuing offense that can be executed through a plan or scheme, see 18 U.S.C. § 1589(a)(4), the jury could find based on such testimony that Cooper initiated the plan to force J.C. to strip at Junior's Cabaret while they were living in Massachusetts.

Although Cooper disputes these facts and claims that, at most, they show legally insufficient "preparatory acts" in Massachusetts, we "routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." Guerrier, 669 F.3d at 4. The only case that Cooper cites to support his position held that "a

- 34 -

district court may consider a pretrial motion to dismiss an indictment where the government does not dispute . . . the pertinent facts." (Quoting United States v. Rodríguez-Rivera, 918 F.3d 32, 35 (1st Cir. 2019) (citation modified).)  But, as the government points out, under Rodríguez-Rivera, a district court may not dismiss an indictment on factual grounds before trial unless the government agrees that it has already laid out all evidence relevant to the issue at hand.  See id. at 35-36.  And here, the government did not expressly concede in its opposition to Cooper's motion to dismiss that it had previewed all the relevant facts.  Thus, we see no error in the district court's ruling.

## 2. Sufficiency Challenge

Next, Cooper contends that the evidence the government presented at trial on the forced labor charge was insufficient to establish venue in Massachusetts by a preponderance of the evidence.  We review "the evidence of record in the light most flattering to the venue determination." Salinas, 373 F.3d at 164.  Ultimately, whether there was enough evidence to support a finding of proper venue is a question of law.  Miller, 111 F.3d at 749 (citing 2 Wright & Miller's Federal Practice & Procedure § 307 (2d ed. 1982)).

The forced labor statute makes it a crime whenever an individual:

[K]nowingly provides or obtains the labor or services of a person by any . . . combination of [four] means [including] . . . by means of force [or] threats of force . . . [;] . . . by means of serious harm or threats of serious harm . . . [;] . . . [or] by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, . . . [they] would suffer serious harm . . . .

18 U.S.C. § 1589(a). Because the statute "contains no explicit venue provision," we look to the "substantive definition of the crime" to determine where venue would be proper. Salinas, 373 F.3d at 165. This analysis requires us to "'identify the conduct constituting the offense' -- the things a defendant must do to violate the statute at issue," and then "ascertain the 'location' of those 'criminal acts' -- the place where their 'commission' occurred." Abouammo, 146 S. Ct. at 1576 (quoting United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999)).

The parties' venue dispute centers on whether the forced labor began in Massachusetts or New York. And that is because Cooper has not contested, other than in a short footnote in his opening brief, that we can treat forced labor as a continuing offense in resolving this appeal. For continuing offenses, venue can be established wherever the "offense was begun, continued, or completed," 18 U.S.C. § 3237(a), and the government has not argued that the forced labor continued or ended in Massachusetts. Thus, we focus on where the offense began.

According to Cooper, the venue claim is a slam dunk for him.  As he points out, the forced labor charge was based on J.C.'s work as a stripper at Junior's Cabaret, and she did not begin working there until September 2018, several months after they moved to New York.  He argues that even if he had hatched a plan to force J.C. to work as a stripper while they still lived in Massachusetts, any acts he took to further that plan in that state were merely "preparatory" and thus legally insufficient.  Cooper cites to out-of-circuit precedent for the premise that "preparatory acts alone cannot support venue."  (Quoting United States v. Strain, 396 F.3d 689, 697 (5th Cir. 2005) (holding that the defendant's "telephone conversations" and "subsequent journey" originating in the district were "preparatory acts" for the offense of harboring a fugitive).)

The government counters that § 1589 does not just criminalize obtaining labor; it criminalizes obtaining labor "by prohibited means," such as through a "scheme, plan, or pattern" or "threats of force."  See 18 U.S.C. § 1589(a)(1), (4).  It also argues that the "prohibited means" requirement is an element of the crime, and thus the scheme, plan, or threats of force are intrinsic to the crime itself.  And the government points out that this is exactly how the district court instructed the jury; the court explained that, for Count Three, the jury "must find that the defendant used or employed one or more of the three identified

prohibited means to provide or obtain the labor or services of the alleged victim."

We agree with the government's reading of § 1589(a). The forced labor statute criminalizes more than just "obtain[ing] the labor" of a person; it criminalizes obtaining the labor "by" one of the four prohibited means. 18 U.S.C. § 1589(a)(1)-(4); see Martínez-Rodríguez v. Giles, 31 F.4th 1139, 1149 (9th Cir. 2022) (holding that the "actus reus" of § 1589(a) "requires proof that the defendant provided or obtained the labor or services of a person by one or more of the four enumerated means" (citation modified)); cf. United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004), vacated on other grounds, 545 U.S. 1101 (2005) (explaining Congress "intended expressly to counter" a narrow interpretation of the forced labor statute that would limit the "prohibit[ed] . . . conduct" to only "physical or legal coercion" (emphasis omitted)).

Viewing the trial record in the light most favorable to the government, we conclude that it presented enough evidence for a rational jury to find, by a preponderance of the evidence, that the "scheme, plan," or "threats of force" to compel J.C. to work as a stripper began in Massachusetts. Thus, we reject Cooper's sufficiency challenge as to venue.

### 3. Jury Instruction

At the charge conference, Cooper requested that the district court put the question of venue to the jury. He proposed an instruction that would have required the jury to decide:

> [W]hether, as to each separate count, there is a sufficient connection to the District of Massachusetts[.] . . . You should note on this issue -- and this issue alone -- the Government need not prove venue beyond a reasonable doubt, but only by a preponderance of the evidence.

The court declined to give that instruction or any jury instruction on venue.

Cooper contends that the district court legally erred by not putting the issue of venue to the jury. He maintains that a venue instruction was "integral to [his] defense," pointing to his closing argument that "venue [was] not proper" in Massachusetts for the forced labor offense because "[a]ll of [the offense] took place in New York." According to Cooper, taking the venue determination away from the jury was not harmless error, and thus we must vacate his forced labor conviction.

### i. Waiver

In response, the government contends that Cooper waived his claim that the jury should have decided the question of venue, and thus we need not address the merits of his challenge. It offers an assortment of waiver arguments, including that Cooper's proposed jury instruction on venue was "not a 'correct' statement

of law" and that he failed to ask the district court to "deliver its own, correct venue instruction."  On top of these initial points, the government emphasizes that we have never "held that [our] theory-of-defense precedent applies to venue instructions."

At the same time, the government does not dispute -- nor could it -- that Cooper requested at the charge conference that the jury decide whether venue was proper in Massachusetts.  It also concedes that Cooper both objected when the district court failed to instruct the jury on venue at the close of trial and moved for acquittal or a new trial on venue grounds after the verdict.  Finally, it admits that the district court refused to instruct the jury on venue not because it disagreed with Cooper's particular proposed instruction, but because it concluded that the issue should not go to the jury at all.  As the court stated: "I'm not going to instruct on venue."

We have not yet had occasion to determine when venue should be decided by the jury.  But the government and Cooper agree that United States v. Perez, 280 F.3d 318 (3rd Cir. 2002), is the leading federal court opinion on this issue.

Under the Perez framework, when the indictment alleges venue without a facially obvious defect,[8] a defendant has a valid

---

[8] As a reminder, Cooper also moved to dismiss Count Three of the indictment for lack of venue in Massachusetts, so he would have satisfied the Perez framework even if the indictment had "a facially obvious defect."

- 40 -

claim to put the question of venue to the jury "if (1) [he] objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) [he] timely requests a jury instruction." Perez, 280 F.3d at 334; see also, e.g., Miller, 111 F.3d at 751 (explaining that "[s]everal circuits have adopted the 'in issue' test"); United States v. Haire, 371 F.3d 833, 840 (D.C. Cir. 2004) (adopting Perez's so-called "in issue" framework), judgment vacated on other grounds, 543 U.S. 1109 (2005). Some disagreement does exist on how much a defendant must do to create a genuine dispute of material fact about proper venue such that the issue must go to the jury. See Perez, 280 F.3d at 333-34. But we are not aware of any court that has concluded that a defendant who satisfies the Perez framework has waived such a claim altogether.

We hold that a defendant who meets the Perez framework has done enough to put the court and the government on notice of his claim that the jury should decide the question of venue.[9] The record is clear that, via his actions before, during, and after trial, Cooper checked all the boxes under the Perez framework. Thus, we reject the government's waiver arguments.

_____

[9] We do not mean to suggest that Perez establishes the floor for what a defendant must do to preserve a claim that a jury should decide the issue of venue. But because Cooper has satisfied the Perez framework, we need not delve further into that question.

- 41 -

## ii. Merits

We now turn to the merits -- whether, on the facts here, Cooper placed venue for the forced labor charge "in issue" such that the jury had to decide if venue was proper in Massachusetts.

Cooper's argument is simple. He contends that, throughout the case, the government maintained that the forced labor charge was based on J.C.'s work as an underage stripper at Junior's Cabaret in New York. And as Cooper points out, J.C. did not even begin working at Junior's Cabaret until September 2018, three months after they moved to New York. Thus, Cooper asserts, a rational jury easily could have found that the proper venue for the forced labor charge was New York. And, as Cooper highlights, he made this very claim to the jury at trial. In his closing argument, he emphasized that the "government's theory" of the forced labor offense was that he forced J.C. to work as a stripper. "All" of that alleged conduct "took place in New York," he argued, and thus "venue [was] not proper" in Massachusetts.

Cooper also contends that he generally disputed J.C.'s testimony at trial, including that he forced her to work at Junior's Cabaret by threatening her in Massachusetts with various forms of harm if she refused. To that end, he argues that, even if the trip to New York in April 2018 could be considered part of the forced labor offense based on J.C.'s testimony, he created a genuine dispute at trial about the reason for that trip. See supra

section II.B.2.  In response, the government essentially concedes this point.[10]

We conclude that Cooper did enough to put venue "in issue" at his trial.  To be sure, federal courts have articulated various standards for what qualifies as a defendant putting venue "in issue."  See Perez, 280 F.3d at 333-34 (discussing how different circuits articulate the "in issue" test).  But the majority view is that "actually disput[ing]" the location of the crime charged by, for example, placing testimony or documents into the trial record is enough.  Id. at 334-35 (explaining that "[t]rial testimony" that "establish[es] a genuine issue of material fact" "may place venue in issue"); see also Miller, 111 F.3d at 751 (holding that if a defendant "create[s] a factual dispute" at trial "with respect to the location of the crime," whether through "trial testimony or otherwise," they have placed venue in issue).[11]  We agree with the majority view.

---

[10] When pressed at oral argument, the government acknowledged that if the jury credited Cooper's testimony, it was enough to create a factual dispute that put venue "in issue."  It then conceded that, under Perez, Cooper would have been entitled to a jury instruction on venue in light of such a factual dispute.

[11] The Seventh Circuit, however, has suggested that a defendant must "make venue a serious issue" to put the venue question to the jury.  United States v. Muhammad, 502 F.3d 646, 656 (7th Cir. 2007) (emphasis added) (holding that the defendant did not put venue "in issue" because the government's countervailing evidence on the location of the crime was "overwhelming").  It is not entirely clear if the Seventh Circuit's decision in Muhammad rested on the conclusion that the evidence

- 43 -

Because Cooper put venue "in issue" for the forced labor charge with his trial testimony, it was legal error for the district court not to instruct the jury to decide the question of venue.[12]

### iii. Harmless Error

The government claims that any error in failing to put the venue issue to the jury was harmless. It argues that the jury's verdict on the other counts makes the possibility that the jury would have rejected venue in Massachusetts for the forced labor charge "vanishingly remote."

Several of our sister circuits have evaluated claims of error based on a district court's failure to put the venue question to the jury. See, e.g., Miller, 111 F.3d at 750; Perez, 280 F.3d at 333-35; United States v. Moran-Garcia, 966 F.3d 966, 969 (9th Cir. 2020). These courts agree that such error, although of "constitutional magnitude," "is not structural," meaning the error "does not deprive the trial of fundamental fairness." Casch, 448 F.3d at 1117 (citing Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991)); cf. Johnson v. United States, 520 U.S. 461, 468 (1997)

_____

introduced by the defendant in that case was too thin to create a "genuine" dispute. In any event, Cooper did enough here even under the test in Muhammad, because the government's venue evidence on the forced labor charge was not "overwhelming."

[12] Although we decide today that testimony or other record evidence disputing the location of the crime is sufficient to put venue "in issue," we do not purport to define all the ways a defendant may put venue "in issue."

("We have found structural errors only in a very limited class of cases."). Instead, like other trial errors, these courts generally review this error for harmlessness. See Casch, 448 F.3d at 1117; Miller, 111 F.3d at 751 (reviewing for harmless error).

Consistent with the consensus view, we hold that the failure to give a venue jury instruction should be subject to a harmless error analysis. See, e.g., Moran-Garcia, 966 F.3d at 970; United States v. Kelly, 535 F.3d 1229, 1239 n.7 (10th Cir. 2008). Thus, the "burden is on the government to prove beyond a reasonable doubt" that a failure to give a venue instruction was harmless. Miller, 111 F.3d at 751; see also Fed. R. Crim. P. 52(a).

Although our sister circuits agree that it is the government's burden to show that this error was harmless, they disagree to some extent on when a failure to put the venue question to the jury is "harmless beyond a reasonable doubt."[13] We have previously suggested that "[w]hen proof of venue is so clear that

---

[13] For example, the Fourth Circuit formulates a slightly less demanding test, holding such error is harmless "where the evidence of proper venue was 'substantial and uncontroverted.'" United States v. Taylor, 784 F. App'x. 145, 152 (4th Cir. 2019) (quoting United States v. Martinez, 901 F.2d 374, 377 (4th Cir. 1990)). By comparison, the Tenth Circuit requires a showing that "the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue." Kelly, 535 F.3d at 1239 n.7 (quoting Miller, 111 F.3d at 751). And the Ninth Circuit requires that the "evidence, had it been viewed by a rational jury, could only have led to" a finding of proper venue. Moran-Garcia, 966 F.3d at 970 (citation modified).

- 45 -

no reasonable juror could have found otherwise," any error in instructing on venue could not qualify as plain error. United States v. Georgacarakos, 988 F.2d 1289, 1297 (1st Cir. 1993). To be sure, our ruling in that case concerned a legally incorrect jury instruction on venue, not the failure to give an instruction altogether. See id. But our discussion in Georgacarakos on what could constitute plain error when it comes to instructing the jury on venue is informative and indicates that a failure to instruct may be harmless if no reasonable juror could have found that venue was lacking. See id.; see also Moran-Garcia, 966 F.3d at 970 (holding that when "a court has failed to give a venue instruction to the jury, that error will be viewed as harmless if the evidence viewed rationally by a jury could only support a conclusion that venue existed" (citation modified)); Kelly, 535 F.3d at 1239 n.7 (explaining that "failure to instruct on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue" (quoting Miller, 111 F.3d at 751)).

In any event, even under the most government-friendly version of the harmless error standard in the venue context, we cannot conclude that the error here was harmless beyond a reasonable doubt. On our review of the record, the jury could have convicted Cooper on the first two counts without necessarily

concluding that venue was proper in Massachusetts for the forced labor charge.[14]  For example, the jury could have found that Cooper sex trafficked J.C. by force until April or May 2018, while they lived in Massachusetts, supporting a guilty verdict on Count One. It also could have concluded that Cooper transported J.C. to New York in April 2018 with an intent to prostitute her, supporting a guilty verdict on Count Two.  Yet the record provides no clues on how the jury conceived of venue for Count Three because the evidence could have supported a finding that the forced labor (1) began in Massachusetts or (2) occurred entirely in New York. Without any venue instruction, the jury could have convicted on Count Three without ever considering if Cooper formulated a plan or scheme to force J.C. to strip while they were still in Massachusetts.[15]

Although the government suggests that the jury could have conceived of the "forced labor" as Cooper prostituting J.C.,[16]

---

[14] Because Count Three of the indictment referred to both the District of Massachusetts and the Southern District of New York, it is the kind of "multidistrict indictment" that precludes "find[ing] the elements of the charged offense without finding the factual predicate for proper venue in the trial jurisdiction." Miller, 111 F.3d at 751.

[15] This is especially so given that the district court explicitly instructed the jury that it "may accept all of a witness's testimony or reject all of it, or you may accept part and reject another part."

[16] The government raised this alternative theory for the first time on appeal.  To support this theory, it pointed to a jury note

that was not the theory it pursued at trial. At the start of the case, the government presented Count Three as based on Cooper forcing J.C. to work at Junior's Cabaret. It reiterated that theory at the end of the trial. In its closing argument, after asserting that Cooper "forc[ed] J.C. to work at Junior's Cabaret," the government stated that, "[f]or this criminal conduct, the defendant [was] charged in Count Three with forced labor." It then went on to explain to the jury why, in its view, it had met its burden to "prove that [Cooper] used force [or other threats] to keep J.C. stripping at the club and giving her money to him." And the government then called out the specific evidence that supported this claim: J.C.'s testimony "about the violence in New York," and the "text messages of threats" to J.C. "when they were down in New York."

Given the government's arguments throughout trial, the jury could have convicted Cooper on the forced labor charge by finding that he forced J.C. to work as an underage stripper at Junior's Cabaret from September 2018 to May 2019 -- conduct that

---

asking whether the forced labor for Count Three "consist[s] of just stripping or" whether it "include[s] prostitution." In response, the district court repeated its instruction that "the words 'labor' and 'services' [sh]ould be construed based upon the[ir] ordinary meaning." This single jury note is not enough for us to conclude that any error was harmless beyond a reasonable doubt on the ground that the jury must have convicted Cooper of forced labor under the prostitution theory. See Moran-Garcia, 966 F.3d at 970.

occurred entirely in New York.  Thus, we cannot conclude that the government has established that the failure to put the venue question to the jury was harmless beyond a reasonable doubt.

### III. CONCLUSION

For all these reasons, we **affirm** the convictions on Count One and Count Two, **vacate** the conviction on Count Three, and **remand** for further proceedings consistent with this opinion.[17]

---

[17] Because we vacate Cooper's conviction on Count Three, we do not address his sentencing challenges.